UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ORLANDO LARRY,

     Plaintiff,

               Case No. 16-cv-1108-pp

   v.

RUSSELL GOLDSMITH,
and MATTHEW FRIEND,

     Defendants.

---

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 70)

---

The plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. Dkt. No. 1. On November 23, 2016, the court allowed the plaintiff to proceed on three claims: that defendant Donald Morgan violated his Fourteenth Amendment due process rights; that Matthew Friend and Russell Goldsmith[1] violated his First Amendment right to exercise his religion; and that a John Doe defendant violated his Eighth Amendment rights. Dkt. No. 12.

On June 26, 2017, the court dismissed the remaining John Doe defendant because the plaintiff had not identified him by the deadline the court had set. Dkt. No. 42 at 3. On March 30, 2018, the court dismissed Morgan because the plaintiff had failed to exhaust the available administrative remedies before suing him. Dkt. No. 57 at 13-14. The court also dismissed one

---

[1] Because the plaintiff did not know all the defendants' names when he filed his complaint, he used John Doe placeholders. The court later allowed him to substitute Matthew Friend and Russell Goldsmith for two of the Doe placeholders. Dkt. No. 42.

component of the plaintiff's First Amendment claim against Friend on the same basis. Id. at 15. The only remaining claim is that Friend and Goldsmith violated the plaintiff's First Amendment right to exercise his religion when they prohibited him from praying on August 2, 2011. Id. at 19.

On August 17, 2018, Friend and Goldsmith filed a motion for summary judgment on that remaining claim. Dkt. No. 70. The parties have briefed the motion. Dkt. Nos. 71, 77, 83. The court will grant the defendants' motion and dismiss the case.

## I.    FACTS[2]

The plaintiff was incarcerated at Columbia Correctional Institution from July 28, 2011 until January 3, 2012. Dkt. No. 84 at ¶1. Goldsmith and Friend both worked at Columbia during that time, Goldsmith as a correctional officer and Friend as a correctional sergeant. Id. at ¶¶4-5.

When the plaintiff arrived at Columbia, he was housed in Housing Unit 10, which is also known as the Barracks. Id. at ¶6. According to the defendants, the Barracks is a temporary housing unit for general population inmates who are awaiting transfer to a medium- or minimum-security facility or who are waiting to be placed in a program at a Division of Community Corrections facility. Id. at ¶7. The plaintiff argues that Columbia is a maximum security facility, and that the inmates housed in the Barracks were coming from lower-security facilities and were on their way to other lower-security facilities. Id. He disputes that the inmates in the Barracks were "part of the [Columbia] general population." Id. at ¶8.

_____

[2] The court takes most the facts from Defendants' Reply to Plaintiff's Response to Defendants' Proposed Findings of Fact. Dkt. No. 84. The facts are undisputed unless the court notes otherwise.

The Barracks is separated into two sides, A and B, and each side is separated into four quads. Id. at ¶8. The quads have barracks-style double bunks, separated by three-by-eight-foot rows. Id. An officer control station is located at the front of the Barracks that overlooks both sides of the unit; there is an officer's desk on each side of the unit between the front and back quads. Id. at ¶9. The defendants explain that there is a dayroom and dining area in the center of the Barracks; the plaintiff clarifies that each quad has its own dayroom and dining area. Id. at ¶10.

The Barracks dayroom was generally open from 7:30 a.m.—11:00 a.m., 12:30 p.m.—4:00 p.m., and 5:30 p.m.—9:00 p.m. Id. at ¶11; Dkt. No. 75-1 at 18. When the dayroom is open, inmates may freely move around the Barracks to do things like playing games, watching television, making phone calls, exercising, showering or praying. Id. at ¶12. When the dayroom is closed, inmates must be at their bunks. Id. at ¶13. (The plaintiff asserts that there is "no rule in the Red Book requiring inmates to be in their bunks after the 9:10 p.m. count." Id.)

According to the defendants, rules for the Barracks were listed in the Red Book, which was located on the unit and available for review upon request. Id. at ¶14. The plaintiff says that when an inmate went through orientation at the Barracks, correctional staff was supposed to provide him with a copy of the Red Book; he says that instead of doing that, Columbia staff posted certain pages of the Red Book in the common areas. Id.

The Red Book says that inmates cannot exercise or pray on the floor by their bunks when the dayroom is closed. Id. at ¶15. It states, "Inmates may perform floor exercises and prayers in the area on the side of their bunks, one at a time, in agreement with their bunkmate, during dayroom hours only." Id.; Dkt. No. 75 at 20. The defendants indicate that this rule allowed inmates to

pray on the floor by their bunks when the dayroom was open, and that it did not prohibit them from praying silently *in* their bunks when the dayroom was closed. Dkt. No. 84 at ¶16. Night-time quiet hours started after the 9:10 p.m. count. Id. at ¶18. The defendants indicate that during this time, inmates' movement is limited to using the restrooms (up to three inmates at a time); the plaintiff says inmates also were allowed to access their lockers. All other movement is restricted. Id. at ¶18.

The defendants say that inmates must remain in their bunks during quiet time because it is more efficient for security staff. Id. at ¶19. Officers can observe the inmates in their bunks from the officer's desk or the control center; if the inmates are moving around, officers are required to walk around the unit to monitor the inmates. Id. The plaintiff argues that because of the location of the control room, there are blind spots that prevent officers from seeing inmates; he says the officers still would have to talk around on a regular basis to account for all the inmates. Id.

The plaintiff is Muslim, and, as part of his religion, he performs prayers at least five times each day. Id. at ¶2. The parties agree that one round, or "Rak'ha," of prayer requires the plaintiff to stand, then to prostrate himself, then to stay in a seated position for a short while, then return to a standing position. Id. The plaintiff indicates that it usually takes about five minutes to complete four Rak'has (and a worshipper performs two to four Rak'has, depending on which time of day he is praying). Id. at ¶3. Worshippers must perform the prayers at specific times. Id. at ¶24; Dkt. No. 69 at 12, Tr. pp. 43-44.

According to the plaintiff, officers did not begin to enforce the Red Book rule prohibiting inmates from praying when the dayroom was closed until the beginning of the month of Ramadan. Dkt. No. 84 at ¶16. Specifically, on

August 2, 2011, just after 10:00 p.m., Goldsmith observed inmate Denyal Kahali praying in his bunk row. Id. at ¶21. Goldsmith approached Kahali and told him that he could not pray. Id. The plaintiff, who says he hadn't yet begun to pray, approached Goldsmith and informed him that he and Kahali had to pray at that time. Id. at ¶¶ 21, 23. Chaplain Teslik had given the plaintiff a timetable, which specified that the final prayer that day must occur between 9:55 p.m. and 4:16 a.m. Id. at ¶35; Dkt No. 74-1 at 3, 13. According to the plaintiff, Goldsmith told him that they could not pray when the dayroom was closed and that he would be giving the plaintiff and inmate Theodore Deibert conduct reports. Id. at ¶22.

The plaintiff returned to his bunk row and started his prayer. Id. at ¶23. After finishing, he saw Kahali and inmate Anthony Garcia talking to Goldsmith. Id. at ¶24. The plaintiff joined them, and the three inmates tried to explain to Goldsmith that their religion required that they pray at certain times. Id.; Dkt. No. 69 at 43:20 – 44:14.

After this interaction, Goldsmith issued the plaintiff a conduct report for disobeying orders, group resistance and petitions, disruptive conduct and violation of institutional policies and procedures. Dkt. No. 84 at ¶25. (The plaintiff says that even before Goldsmith issued the conduct report, he had the plaintiff placed in the temporary lockup unit, and he disagrees with the conduct report's version of what happened. Id.) The adjustment committee found the plaintiff guilty of disobeying orders, disruptive conduct and violation of institutional policies and procedures, and gave him sixty days of disciplinary separation. Id. at ¶30. The defendants say that the plaintiff was able to perform his prayers that evening, and that no other officer ever again told the plaintiff that he could not pray at a certain time. Id. at ¶32.

## II.    DISCUSSION

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### B.    Analysis

#### 1.    *Matthew Friend*

For an individual to be liable under §1983, he must be "personally responsible for the deprivation of the constitutional right." Matthews v. City of

E. St. Louis, 675 F.3d 703, 708 (7th Cir. 2012) (quoting Chavez v. Ill. State Police, 251 F.3d 612, 651 (7th Cir. 2001)). For a supervisor to be liable for a supervisee's violation of someone's constitutional rights, the supervisor "must have know[n] about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what they might see." Id. (quoting Jones v. City of Chi., 856 F.2d 985, 992-93 (7th Cir 1988)) (internal quotation marks omitted).

At his deposition, the plaintiff testified that he did not remember Friend being present during his interaction with Goldsmith on August 2, 2011. Dkt. No. 69 at 13, Tr. p. 45. The plaintiff didn't even know whether Friend was working at that time—he believed that Friend's shift already may have ended by the time he spoke to Goldsmith. Id. Despite this, the plaintiff argued in his brief in opposition to summary judgment that the court should deny Friend's motion because Friend "was the one who initially told the Plaintiff that he would not be allowed to pray without explanation." Dkt. No. 77 at 5. See also Dkt. No. 78 at ¶22 ("On August 1, 2011, I was informed by defendant Friend that I would not be allowed to pray.") The plaintiff argued that "after being informed by the Plaintiff that they were not suppose to interfere with the Plaintiff's prayers," Friend "was observed by the plaintiff and another Muslim inmate, Anthony Garcia, inside of the officer control station with Defendant Goldsmith staring at them" Dkt. No. 77 at 6. The plaintiff says that the incident with Goldsmith happened the next day. Id. Finally, the plaintiff asserts that Friend's was Goldsmith's "superior," and that he held a higher rank than Goldsmith. Id.

The plaintiff has presented no evidence that Friend was Goldsmith's supervisor, or that Friend had any supervisory authority over Goldsmith. He has alleged only that Friend held a superior rank to Goldsmith. This is true, as

far as it goes—Goldsmith was a corrections officer and Friend was a sergeant at the time of the events in the complaint. But the simple fact that Friend outranked Goldsmith does not make him liable for Goldsmith's actions. In fact, as the court has noted, even if Friend *had been* Goldsmith's supervisor, the law says that a supervisor is not liable for his supervisee's conduct just because he is that person's supervisor. Horshaw v. Casper, 910 F.3d 1027, 1029 (7th Cir. 2018) ("supervisors are responsible for their own acts but not for those of subordinates").

The only question, then, is whether the plaintiff has provided evidence raising a genuine dispute of material fact about whether Friend played some part in Goldsmith's alleged denial of the plaintiff's First Amendment right to pray. He has not. The plaintiff has argued that on August 1, 2011—the day *before* the incident with Goldsmith—Friend told him that he would not be allowed to pray, and didn't give the plaintiff a reason. Even if that is true, the plaintiff has provided no evidence to show that Friend communicated this to Goldsmith. The plaintiff also has argued that on the same day—August 1, 2011—he and another inmate saw Friend and Goldsmith together in the control booth, giving them "unpleasant looks." Dkt. No. 78 at ¶23. Even if that is true, it does not raise a genuine dispute of material fact that Friend played some part in what happened on August 2, 2011. A jury could not reasonably conclude from Friend's alleged statement to the plaintiff on August 1, and the alleged fact that he and Goldsmith stared unpleasantly at the plaintiff on that day, that Friend was involved in the incident with Goldsmith on August 2, even though he was not present. The plaintiff has presented nothing more than speculation, based on slim facts.

Because no reasonable jury could conclude that Friend was personally involved in Goldsmith's decision to order the plaintiff to stop praying, the court will grant summary judgment in favor of Friend.

2. *Russell Goldsmith*

a. New arguments

The court allowed the plaintiff to proceed with a First Amendment free exercise claim against Goldsmith based on his allegations that Goldsmith ordered him not to pray and then gave him a conduct report after the plaintiff disobeyed his orders and prayed. In his response to the defendants' motion for summary judgment, the plaintiff raises new claims that he did not assert in his complaint. He argues that Goldsmith's actions violated the Religious Land Use and Institutionalized Persons Act (RLUIPA). Dkt. No. 77 at 11. He alleges for the first time that Goldsmith retaliated against him for exercising his First Amendment rights. Id. at 8-9. He argues that the policy of not allowing inmates to pray on the floor between their bunks when the dayroom is closed is unconstitutional, implying that it violates the Equal Protection Clause because it impacts Muslim inmates differently than inmates of other faiths. Id. at 13-14. "It is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion." Abuelyaman v. Ill. State Univ., 667 F.3d 800, 814 (7th Cir. 2011). Because the court did not allow the plaintiff to proceed on any claims other than a First Amendment free exercise claim, and because the plaintiff did not raise these other claims and arguments prior to his response to the defendants' motion, the court will not consider them.

b. Free exercise Standard

The threshold question under the Free Exercise Clause is whether the plaintiff has raised a genuine dispute regarding whether Goldsmith substantially burdened his religious exercise. See Jackson v. Raemisch, 726

F.Supp.2d 991, 998 (W.D. Wis. 2010) (citing <u>Hernandez v. C.I.R.</u>, 490 U.S. 299, 306-07 (1986)). A "substantial burden" is "one that necessarily bears a direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." <u>Id.</u> (quoting <u>Civil Liberties for Urban Believers v. City of Chi.</u>, 342 F.3d 752, 761 (7th Cir. 2003).

### c. Good faith argument

The defendants first argue that the court should grant summary judgment for Goldsmith because in telling the plaintiff that he could not pray on the floor between bunks at a time when the dayroom was closed, Goldsmith was enforcing an institution policy. Dkt. No. 71 at 7. They cite <u>Steckenbach v. VanDensen</u> for the proposition that "[i]f an officer is following the policy in place and is not responsible for promulgating the policy, his [sic] should not be found personally liable under § 1983." <u>Id.</u> The defendants read <u>Steckenbach</u> too broadly. That decision involved a prison policy requiring that "property left on deposit had to be collected within 30 days," and that "if that did not occur, the prison's staff was to ship the property to someone the inmate had designated." <u>Steckenbach</u>, 868 F.3d 594, 596 (7th Cir. 2017). The policy further provided that "if the inmate's account did not have enough money to cover shipping costs, the property was to be destroyed." <u>Id.</u> The policy "warned inmates that they were responsible for ensuring that their accounts had enough money on the 30th day." <u>Id.</u>

When Steckenbach did not pick up some boxes his father had left him within the thirty-day period, defendant VanDensen (who was in charge of the mail room) calculated the shipping cost; it was more than the plaintiff had in his trust account. <u>Id.</u> So VanDensen, following the policy, had the property destroyed. <u>Id.</u>

The plaintiff alleged that VenDensen violated his due process rights by destroying his property without notice. Id. The Seventh Circuit disagreed. It accepted the plaintiff's assertion that he did not know about the property destruction policy, and that the officer who received the boxes from his father failed to calculate the shipping charges and warn him that he had to have that amount in his inmate account on the 30th day. Id. But the court held that those failures could not "be blamed on VanDensen," because he wasn't responsible for giving notice of the policy and he wasn't the officer responsible for notifying the plaintiff of the need to have the amount of the shipping costs in his inmate account on the 30th day. Id. at 596-97. The Seventh Circuit said, "[a]ll VanDensen did was carry out the policy after no one collected the boxes within 30 days." Id. at 597.

The defendants reach too far when they interpret this statement as a holding that a prison official who follows a prison policy he did not create cannot be held liable under §1983. Steckenbach held only that it was the officers who failed to notify the plaintiff of the policy, and who failed to notify him that he had to keep the amount of the shipping charges in his account, who arguably were the sources of the constitutional violations, not VanDensen.

The defendants also cite Shidler v. Moore, 409 F. Supp. 2d 1060 (N.D. Ind. 2006) in support of their claim that an officer who was just following policy cannot be held liable under §1983. Again, they reach too far. The court in Shidler screened the plaintiff's complaint and found that he had not stated a claim against four officials who reviewed his grievances that other officials had violated his free exercise rights by restricting his ability to participate in communal worship. Id. at 1068. The court stated that these "grievance officials, though they had actual knowledge of the restriction, were low level personnel who neither created the policy nor could they have changed it." Id. This a

11

district court decision from Indiana; it is not binding on this court. The judge did not cite any case law in support of this conclusion, and did not actually say that he was dismissing these defendants on the ground that they were just following a policy.

The court has not found a decision holding that if a prison official was following a policy he did not create, he cannot be held liable under §1983. If such precedent exists, the defendants did not cite it. The argument that Goldsmith was merely enforcing prison policy sounds more like an argument that he was acting in good faith. Rule 8(c)(1) of the Federal Rules of Civil Procedure requires a party filing a responsive pleading to affirmatively state affirmative defenses in that pleading. The defendants asserted a good-faith defense in their answer. Dkt. No. 15 at 7. In reality, though, the "good faith" defense for state-law defendants in §1983 suits is the defense of qualified immunity. In Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982), the Supreme Court referred to "[q]ualified or 'good faith' immunity." Almost thirty years ago, the Seventh Circuit held that "[p]ublic officials who enjoy qualified immunity may assert their good faith as a complete defense to damages liability under 42 U.S.C. s1983." Jaworski v. Schmidt, 684 F.2d 498, 499 (7th Cir. 1982). See also, Williams v. Lane, 851 F.2d 867, 882 (7th Cir. 1988) (citing Procunier v. Navarette, 434 U.S. 555, 562 (1978)) ("Prison officials who act in good faith receive qualified immunity for their actions.").

The defendants also have pled the affirmative defense of qualified immunity, and they argue it at the end of their brief. The court will not analyze whether Goldsmith is entitled to that defense, however, because it finds for the reasons below that Goldsmith is not liable for violating the plaintiff's First Amendment rights.

Next, the defendants argue that Goldsmith's one-time enforcement of the policy prohibiting inmates from praying between their bunks when the dayroom is closed did not substantially burden the plaintiff's exercise of his religion. Dkt. No. 71 at 9. They point out that even though Goldsmith told the plaintiff that he could not pray after the dayroom closed, he prayed anyway. Id. They assert that the August 2, 2011 incident was a one-off; Goldsmith ordered the plaintiff not to pray on a single occasion, and no other officer ever ordered him not to pray. Id. Finally, they argue that the plaintiff has admitted that in 2011 he did not consistently pray five times per day. Id. The defendants suggest that the plaintiff's admission that he missed a prayer here and there shows that there is no genuine dispute as to whether Goldsmith actions substantially burdened the plaintiff's free exercise of his religion.

The undisputed facts support the defendants' argument that the plaintiff did complete his final prayer of the day on August 2, 2011. Goldsmith told the plaintiff that he could not pray, and that he would be giving the plaintiff and another inmate conduct reports, but the plaintiff returned to his bunk and prayed anyway. But the defendants' argument ignores the fact that Goldsmith's action forced the plaintiff to choose between exercising his religion and risking receipt of a conduct report or not exercising his religion to (possibly) avoid a conduct report. The plaintiff chose to exercise his religion, but he got put in TLU and he received a conduct report. A jury might reasonably find that to tell an inmate that if he prays, he will receive a conduct report, and then giving him one when he does, renders his ability to pray effectively impracticable.

The facts also support the defendants' claim that Goldsmith prohibited the plaintiff from praying on only one occasion. But the plaintiff's faith required

him to pray five times a day, and to do so at specific times. A jury could reasonably find that making it impracticable for a Muslim to pray at one of the five required times of day constituted a violation of his free exercise rights.

The plaintiff testified at his deposition that occasionally he did not complete all five prayers for various reasons, including because he felt lazy or had something else going on. Dkt Nos. 71 at 9; Dkt. No. 83 at 3; Dkt. No. 69 at 6, Tr. pp. 17-18; Dkt. No. 69 at 7, Tr. pp. 22-23. The defendants assert that the fact that Goldsmith ordered the plaintiff not to perform one of the five prayers on one day could not have impeded his free exercise of religion when the plaintiff himself missed a prayer now and then. This argument ignores the fact that the one-time incident occurred during Ramadan, the holiest month of the year for Muslims. See https://ing.org/ramadan-information-sheet/ (last visited March 7, 2019). The plaintiff testified at his deposition that "[d]uring the time of the month of Ramadan was the time [he] was trying [his] best to be obedient and do[] what [he] was supposed to been doing that month." Dkt. No. 69 at 6, Tr. pp. 17-18. And regardless of whether it was Ramadan, the question in a free exercise case is not whether the plaintiff was a "perfect" practitioner of his faith, but whether the *defendant* burdened his ability to practice. A jury could reasonably conclude that Goldsmith's interference with the plaintiff's increased efforts to complete all his prayers during Ramadan substantially burdened his exercise of his religion, even though it occurred only once and even though he might have been less successful in his efforts in other months.

   e. Argument that even if Goldsmith violated the plaintiff's free exercise rights, he had a legitimate penal interest in doing so

The defendants next assert that, even if Goldsmith's action in forbidding the plaintiff from praying at his bunk on August 2, 2011 substantially

14

burdened the plaintiff's exercise of his religion, he had a legitimate penological interest in doing so. Dkt. No. 71 at 9. Prison inmates, unlike people who are not incarcerated, have limitations on their First Amendment rights; "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). "Prison administrators must permit inmates the reasonable opportunity to exercise religious freedom." Williams v. Lane, 851 F.2d 867, 877 (7th Cir. 1988). But they must balance that requirement "against the legitimate goals of the penal institution." Hadi v. Horn, 830 F.2d 779, 783 (7th Cir. 1987) (citation omitted). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). This means that even if a jury could reasonably find that Goldsmith's enforcement of the no-praying-after-the-dayroom-closed policy impermissibly burdened the plaintiff's ability to exercise his religion, he cannot be held liable if that policy was reasonably related to legitimate penological interest.

In determining whether a policy is reasonably related to a legitimate penological interest, a court must consider four factors: (1) whether the restriction is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative means of exercising the right that remain open to the inmate; (3) what impact an accommodation of the asserted right will have on guards and other inmates; and (4) whether there are obvious alternatives to the restriction that show that it is an exaggerated response to penological concerns. Ortiz v. Downey, 561 F.3d 664, 669 (7th Cir. 2009) (citing Turner, 482 U.S. at 89 ). "The burden . . . is not on the State to prove

the validity of prison regulations but on the prisoner to disprove it." <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003) (citations omitted).

As to whether the regulation is rationally related to a legitimate and neutral government objective: the defendants explain that after the dayroom closes at 9:00 p.m., officers conduct a formal standing count at 9:10 p.m., which requires inmates to remain at their bunks. Dkt. No. 71 at 10. After that count, quiet hours begin and movement in the unit is extremely limited until the morning; even for prisoners who need to use the restroom during the night, only three may do so at a time. <u>Id.</u> According to the defendants, fewer officers work during the night shift; so requiring inmates to stay in their bunks enables officers to observe the inmates from the officer's desk or control center rather than having to walk around the unit. <u>Id.</u> This is a more efficient way for officers to ensure all inmates are accounted for through the night. <u>Id.</u> at 10-11. "Prison officials unquestionably have a legitimate interest in maintaining institutional security." <u>Kaufman v. McCaughtry</u>, 419 F.3d 678, 683 (7th Cir. 2005)(citation omitted).

The plaintiff responds that the policy is not necessary to ensure institution security. He counters that there are blind spots from the officer's desk, so officers must walk around the unit anyway. Dkt. No. 84 at ¶¶19-20; Dkt. No. 77 at 13-14. He also asserts that it takes only three officers to effectively secure and run the unit, disputing that policy is the result of low staffing. Dkt. No. 84 at ¶¶19-20.

The plaintiff offers no evidence to support these assertions. He does not state that he has been in the control unit, so the source of his information about blind spots is unclear. He provides no basis for how he would have personal knowledge of the security needs of the unit, and he provides no evidence to support his opinion of what those needs are. The plaintiff has not

raised a genuine dispute about whether the policy is rationally related to the legitimate governmental objective of night-time security, so this factor weighs in favor of the defendants.

As to whether there were alternative means of exercising the right that remained open to the inmate: The defendants indicate that the policy allowed the plaintiff pray whenever the dayroom was open, and that he could pray silently in his bunk even when it wasn't. Dkt. No. 71 at 12. The plaintiff did not respond to this argument. The evidence indicates that the dayroom was open from 7:30 a.m.—11:00 a.m., 12:30 p.m.—4:00 p.m., and 5:30 p.m.—9:00 p.m. Dkt. No. 84 at ¶11. The chart the chaplain provided the plaintiff showed that on August 2, the dawn (fajr) prayer period began at 4:14 a.m., the mid-day (dhuhr) prayer period began at 1:05 p.m., the late afternoon ('asr) prayer period began at 5:03 p.m., the sundown (maghrib) prayer period began at 8:20 p.m., and the bed time ('isha) prayer period began at 9:55 p.m. Dkt. No. 74-1 at 13. Given this schedule, the plaintiff could not have performed the 'isha prayer— the last prayer of the day—on the floor by his bunk, because the dayroom was not open at the time the 'isha prayer period started, and would not have opened again until after the next days' fajr prayer period started at 4:16 a.m. The chart also shows that the prayer periods change over the course of a year (they are tied to the rising and setting of the sun); it appears that the dayroom hours do not change.

The defendants' argument that the plaintiff could have conducted any of the prayers that took place outside dayroom hours by praying silently in his bunk assumes that it is proper, in the Muslim faith, to pray by simply thinking one's prayers, or verbalizing them silently. Yet the defendants themselves stated in their proposed findings of fact that "[p]erforming prayers as a Muslim involves a routine of bowing on the floor and standing," and they recounted the

plaintiff's description of the steps of Rak'ha in their proposed findings. Dkt. No. 72 at ¶2. This factor weighs against a finding that the policy was reasonably related to a legitimate penal interest.

As to the third factor—what impact an accommodation would have on officers and other inmates—the defendants assert that allowing the plaintiff to pray on the floor by his bunk at times when the dayroom is not open "would require more staff to watch the inmates or staff would not be able to monitor the inmates as carefully if more movement were allowed overnight." Dkt. No. 71 at 12. The defendant responds with his unsupported argument that the guards in the control booth cannot see every inmate and so must walk around anyway. As the court has found, the plaintiff provided no evidence in support of this argument. This factor weighs in favor of the policy's reasonable relation to a legitimate penal interest.

Finally, the fourth factor asks whether there were obvious alternatives to the restriction, such that the restriction appears to be an exaggerated response to the safety and staffing concerns the defendants have identified. This is, according to the Supreme Court, a "high standard." Overton, 539 U.S. at 136. The plaintiff argues that the defendants could have "designated a place on the unit for the Muslims to pray 'one at a time' in their view, in lieu of requiring them to pray sitting on their bunk." Dkt. No. 77 at 14-15. The defendants respond that "assuming [the plaintiff's] idea were feasible, it would not have been without cost to the efficiency of keeping the housing unit secure." Dkt. No. 83 at 5.

The court noted earlier that it would not consider the plaintiff's arguments that the defendants violated RLUIPA, because he had not raised that claim in his complaint and the court has not allowed him to proceed on it. RLUIPA requires a state prison receiving federal funds to show that the

18

challenged restriction is the "least restrictive means" of promoting the compelling penological interest. <u>Charles v. Frank</u>, 101 Fed. App'x 634, 635 (7th Cir. 2004). The Religious Freedom Restoration Act of 1993 (RFRA) also has a "least restrictive means" requirement. <u>Holt v. Hobbs</u>, ___ U.S. ___, 135 S. Ct. 853, 860 (2015). In contrast, in a First Amendment free exercise challenge, there is no burden on prison officials "to disprove the availability of alternatives," or to show "that no reasonable method exists by which [prisoners'] religious rights can be accommodated without creating bona fide security problems." <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 350 (1987)(quoting the lower court's decision, <u>Shabazz v. O'Lone</u>, 782 F.2d 416 (3d Cir. 1986)). The Supreme Court specifically rejected the argument that prison policies were subject to "a strict 'least restrictive means' test." <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 411 (1989). "The question is not whether prisons could find ways to accommodate one or another change. It is whether the rule that the prison chooses to implement is 'reasonably related to legitimate security interests.'" <u>Hammer v. Ashcroft</u>, 570 F.3d 798, 801 (7th Cir. 2009) (quoting <u>Turner</u>, 482 U.S. at 91).

The plaintiff implies that his suggestion would be less restrictive, but as the above case law indicates, that is not the question. The question is whether the alternative he suggests was so obviously workable and less restrictive that it shows that the policy the institution adopted was an exaggerated response to its concerns. The plaintiff must identify "some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." <u>Overton</u>, 539 U.S. at 136. He has not.

Depending on the number of practicing Muslims in the Barracks on a given night, the plaintiff's suggestion could pose more of a security risk, and

could be less efficient, than the challenged policy. On any night where there were more than two practicing Muslim inmates in the unit, prison staff would be required to create a schedule for each inmate to take his turn coming to the designated location to pray in view of one of the staff members. If, as the defendants indicate, there are fewer staff members at night, tasking one of those staff members with observing the praying inmates would reduce by one the number of staff available to observe the non-praying inmates. The praying inmates would have to be accommodated at approximately the same time, given the timing requirements for the five prayers. The movement of the praying inmates to and from the designated location would have to be coordinated with the movement of inmates who needed to use the restroom (limited, by unit rules, to three inmates at any given time). This fourth factor weighs in favor of a finding that the policy was reasonably related to a legitimate penological interest.

The court concludes that even if Goldsmith's enforcement of the no-praying-on-the-floor-by-the-bunk policy impermissibly burdened the plaintiff's First Amendment right to freely exercise his religion, his actions nonetheless survive constitutional challenge because the policy was reasonably related to the legitimate penological interests of security and efficiency.

f.      Qualified immunity

Because the court has concluded that Goldsmith is not liable for violating the plaintiff's First Amendment rights because the policy he enforced was reasonably related to legitimate penological interests, it is not required to consider whether Goldsmith is entitled to qualified immunity.

## III.   CONCLUSION

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 70.

The court **DISMISSES** this case and will enter judgment.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 11th day of March, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**